### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **CULEBRA II, LLC,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 07-13-P-H** |
| | ) | |
| **RIVER CRUISES & ANTICIPATION** | ) | |
| **YACHTS, LLC, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |

### RECOMMENDED DECISION ON DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR IMPROPER VENUE OR, ALTERNATIVELY, TO TRANSFER VENUE

The defendants, River Cruises and Anticipation Yachts, LLC ("River Cruises") and James Campbell, move pursuant to Federal Rule of Civil Procedure 12(b)(2)-(3) to dismiss the instant breach-of-contract action for lack of personal jurisdiction and improper venue or, alternatively, to transfer its venue to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1404(a). *See* Defendants' Motion To Dismiss Pursuant to F.R.C.P. (12)(b)(2) and (3) or in the Alternative for a Transfer of Venue Pursuant to 28 U.S.C. §1404(a) ("Motion To Dismiss") (Docket No. 11) & ("Motion To Transfer") (Docket No. 14) at 1; Complaint (Docket No. 1) ¶¶ 21-32.[1]  For the reasons that follow, I recommend that both the Motion To Dismiss and the Motion To Transfer be denied.[2]

---

[1] The defendants combined their motions to dismiss or to transfer venue into one document, which the Clerk's Office docketed as a separate motion to dismiss and a separate motion for transfer of venue. *See* Docket Nos. 11, 14.  I have followed the Clerk's Office's (*continued on next page*)

1

## I.  Applicable Legal Standards

A motion to dismiss for lack of personal jurisdiction raises the question whether a defendant has "purposefully established minimum contacts in the forum State." *Hancock v. Delta Air Lines, Inc.*, 793 F. Supp. 366, 367 (D. Me. 1992) (citation and internal quotation marks omitted). The plaintiff bears the burden of establishing jurisdiction; however, where (as here) the court rules on a Rule 12(b)(2) motion without holding an evidentiary hearing, a *prima facie* showing suffices. *See, e.g., Archibald v. Archibald*, 826 F. Supp. 26, 28 (D. Me. 1993). Such a showing requires more than mere reference to unsupported allegations in the plaintiff's pleadings. *See, e.g., Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992). However, for purposes of considering a Rule 12(b)(2) motion the court will accept properly supported proffers of evidence as true. *See, e.g., id.*

The filing of a Rule 12(b)(3) motion likewise places the burden on the plaintiff to demonstrate the propriety of venue. *See, e.g.*, 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1352 at 321-22 (3d ed. 2004). As in the case of a Rule 12(b)(2) motion, the court accepts a plaintiff's properly supported proffers of evidence as true. *See, e.g., M.K.C. Equip. Co. v. M.A.I.L. Code, Inc.*, 843 F. Supp. 679, 682-83 (D. Kan. 1994).

Per 28 U.S.C. § 1404(a), "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." A transfer pursuant to section 1404(a) lies within the discretion of the court. *See, e.g., Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). The factors to be considered in the

---

convention and treated the unified document as presenting two separate motions.

[2] Were the alternative request to transfer venue a stand-alone motion, I would issue a memorandum decision inasmuch as such motions are non-case-dispositive. *See, e.g., McEvily v. Sunbeam-Oster Co.*, 878 F. Supp. 337, 340 (D.R.I. 1994). However, because in this case the court must first rule on the dispositive motion to dismiss before reaching the alternative request, it seems only sensible to frame the portion of my discussion dealing with transfer as a recommended decision.

exercise of this discretion include the convenience of the parties and witnesses, the order in which jurisdiction was obtained by the district court, the availability of documents, and the possibilities of consolidation. *See, e.g., Cianbro Corp. v. Curran-Lavoie, Inc*., 814 F.2d 7, 11 (1st Cir. 1987). The fact that a prompt trial may be available in one of the districts at issue but not in the other is relevant to the inquiry. *See, e.g., Ashmore v. Northeast Petroleum Div. of Cargill, Inc.*, 925 F. Supp. 36, 39 (D. Me. 1996). The defendant bears "a substantial burden" of demonstrating the need for a change of forum. *See, e.g., Demont & Assoc. v. Berry*, 77 F. Supp.2d 171, 173 (D. Me. 1999). The evidence submitted by the defendant "must weigh heavily in favor of transfer" when this district is the plaintiff's "home forum." *Id*.

## II. Factual Background

The following facts, with conflicts resolved in favor of the plaintiff's properly supported proffers of evidence, bear on the pending motions.

Michael Kiernan, a resident of Bath, Maine, is the sole member and manager of plaintiff Culebra II, LLC ("Culebra"), a Maine limited liability company. Declaration of Michael Kiernan in Support of Plaintiff's Brief in Opposition to Defendants['] Motion To Dismiss or Transfer Venue ("Kiernan Decl."), attached to Plaintiff's Brief in Opposition to Defendants' Motion To Dismiss or Transfer Venue ("Opposition") (Docket No. 15), ¶¶ 1, 3. Kiernan is also the sole member and manager of several other Maine limited liability companies, including Long Reach Marine Group, LLC ("Long Reach"). *Id*. ¶ 3.

Sometime in the spring of 2006 Kiernan placed an advertisement in "Boats and Harbors," a national publication targeting excursion-boat operators. *Id*. ¶ 4; Exh. A thereto. In the ad, he offered for sale a forty-nine-passenger pirate-ship themed vessel he owns called the Black Prince. *Id*. In the middle of September 2006 he received a phone call from defendant Campbell, who said he was

3

responding to Kiernan's advertisement in "Boats and Harbors." Kiernan Decl. ¶ 5. In that first conversation, the two discussed the fact that the Black Prince's hailing port is Bath, Maine, which is where it was located at the time, and that both Kiernan and his company were located in Bath. *Id*. Following that phone call, Campbell sent Kiernan an e-mail dated September 17, 2006 seeking details about the vessel, and Kiernan responded. *Id*. ¶ 6; Exh. B thereto. In his response, Kiernan directed Campbell to his web site, www.longreachmarinegroup.net, for additional information. *Id*. The web site as arranged at the time made clear that the Black Prince was built in Maine by Maine craftsmen and that Kiernan's companies, Culebra and Long Reach, were both based in Maine. Kiernan Decl. ¶ 6.[3]

Between September 17, 2006 and the end of October 2006 Campbell sent numerous e-mails to Kiernan in Maine, and Kiernan initiated numerous e-mails to Campbell from Maine. *Id*. ¶ 7. In all, Kiernan and Campbell exchanged at least forty e-mails in which they addressed many topics related to the vessel and the transaction they were formulating. *Id*. For example, Campbell asked questions about the Black Prince that Kiernan answered, and, at Campbell's request, the two negotiated a lease-to-purchase arrangement ("Lease") rather than a direct sale. *Id*.

On September 20, 2006 Anthony M. Theriault, NAMS-CMS, of Associated Marine Surveyors, Inc. in Yarmouth, Maine, provided Kiernan with an appraisal of the Black Prince. *Id*. ¶ 8; Exh. C thereto. Shortly after receiving the appraisal, Kiernan forwarded it to Campbell to assist him in evaluating the vessel's value. Kiernan Decl. ¶ 8. In September 2006 Kiernan also sent Campbell a copy of the Certificate of Inspection ("COI") issued by the United States Coast Guard ("Coast Guard")

---

[3] Campbell states that his "initial contact" with Culebra was through Kiernan's web site, which he reviewed from Fort Lauderdale, Florida. *See* Affidavit of James Campbell in Support of Motion To Dismiss or[,] in the Alternative, Transfer of Venue ("Campbell Aff."), attached to Motion To Dismiss, ¶ 12. For purposes of resolution of the instant motions, I resolve this conflict in favor of the

(*continued on next page*)

in Maine. *Id*. ¶ 9; Exh. D thereto. The COI lists Bath, Maine as the hailing port of the Black Prince and Gardiner, Maine as the place of its construction. *Id*. The COI also demonstrates that the vessel was properly certified at the time the parties entered into the Lease. *Id*.

On October 4, 2006 Kiernan responded to an e-mail request from Campbell by e-mailing him a suggested *pro forma* for operation of the Black Prince and setting forth certain lease conditions Kiernan would require. Kiernan Decl. ¶ 10; Exh. E thereto. Among other things, Kiernan wanted the lessee to pay to transport the vessel from Maine to the place where it would be operated and to provide a lease deposit sufficient to return the vessel to Maine in the event of a default. *Id*. He also offered to travel to Fort Lauderdale, Florida to help mobilize the vessel, but only if his daily rate and expenses were paid by the lessee. *Id*.

On October 20, 2006 Kiernan sent Campbell an e-mail with the proposed Lease attached. Kiernan Decl. ¶ 11; Exh. F thereto. The Lease had been fully negotiated, and Kiernan noted in his e-mail that he had incorporated terms discussed in previous drafts. *Id*. He asked Campbell to sign the Lease and return it to him in Maine via express mail along with the first month's rent and security deposits. *Id*. He also confirmed that Campbell would obtain insurance coverage listing Culebra as an additional insured and would arrange to have the vessel picked up in Maine sometime after October 20, 2006 by the transport company of his choice. *Id*.

On October 30, 2006 Kiernan sent Campbell an e-mail in which he confirmed receipt in Maine of the executed Lease, along with the first month's rent and one of the required security deposits. Kiernan Decl. ¶ 12; Exh. G thereto. He requested assurance that the other security deposit was on its

---

plaintiff.

way before he would release the vessel for transport. *Id*. He asked again for confirmation of insurance listing Culebra and the lender, Northeast Bank in Lewiston, as additional insureds. *Id*.

The Lease states, in part: "**Applicable Law.** This lease shall be subject to and governed by the laws of the state of Maine regardless of the fact that one or more of the parties now is or may become a resident of a different state." Kiernan Decl. ¶ 13; Lease of Equipment, Motor Vehicles or Tools ("Lease"), Exh. H thereto, at 2, ¶ 8. It was, and is, important to Kiernan to have disputes resolved in Maine because he cannot afford to travel to other places in the country where the vessel might be located. Kiernan Decl. ¶ 13. Because he did not involve a lawyer in the preparation of the Lease, he thought this provision would require disputes to be resolved in Maine. *Id*.

The Lease also states: "**Place of paying rent.** Lessee shall pay rent to the address of Lessor as designated on page one of this lease[.]" *Id*. ¶ 14; Lease at 2, ¶ 7. The address of the Lessor, Culebra, is listed as 870 Washington Street, Bath, Maine 04530. Kiernan Decl. ¶ 14; Lease at 1. Campbell did, in fact, send some payments to Culebra in Bath, Maine until the lessee defaulted and failed to make further payments or respond to requests Kiernan made for assurances. Kiernan Decl. ¶ 14.

Another provision of the Lease states:

At the conclusion of the lease period, the Lessee is responsible to pay all costs of returning the vessel to the Lessor's location in Maine or such other location designated by the Lessor. In the event the Lessee fails to pay such costs as agreed, the Lessor will use the Return Transportation Deposit to pay such costs. In the event the Return Transportation Deposit is not sufficient to cover such costs, funds may be used from the Security Deposit to pay such costs.

*Id*. ¶ 15; Lease at 2, ¶ 6.

The Lease also provides: "**Delivery of equipment or tools.** Lessor shall deliver the Equipment or Tools [the vessel] to Lessee or its agent at [t]he following address: FOB, North End

Coop, Westport Island, Maine."  Kiernan Decl. ¶ 16; Lease at 3, ¶ 12.[4]  Culebra did, in fact, deliver the vessel to River Cruises at Westport Island, Maine.  Kiernan Decl. ¶ 16.  River Cruises hired a transport company to pick the vessel up at Westport Island, Maine.  *Id*.[5]

The Lease requires the lessee to carry liability insurance "in the joint names of Lessor and Lessee[,]" providing that "Lessee shall pay the premiums therefor and deliver to Lessor the policies of insurance[.]"  *Id*. ¶ 17; Lease at 3, ¶ 5.  River Cruises did, in fact, deliver to Culebra in Maine a certificate of insurance listing Culebra in Maine as an additional insured.  Kiernan Decl. ¶ 17; Exh. I thereto.

In addition to the Lease, the parties executed a non-competition agreement to assuage Campbell's concerns about having potential customers drawn away should Long Reach sell or lease another vessel similar to the Black Prince in the vicinity of Fort Lauderdale.  Kiernan Decl. ¶ 18; Exh. J thereto.  That document contains a provision that any disputes arising out of the non-competition agreement are to be resolved by arbitration in Portland, Maine.  *Id*.

After the vessel was delivered to Fort Lauderdale, Kiernan traveled there at the lessee's expense to assist in mobilizing the vessel, a process that included an inspection by the local Coast Guard.  Kiernan Decl. ¶ 19.  Although the Coast Guard in Florida interpreted certain regulations regarding the engine and fuel system configuration differently than had the Coast Guard in Maine and the Coast Guard in Washington, D.C., at no time did the Coast Guard in Florida ever prohibit the vessel from operating with passengers.  *Id*.  The vessel currently has, and always had during the time

---

[4] "FOB" stands for "[f]ree on board" and is a "delivery term which requires a seller to ship goods and bear the expense and risk of loss to the F.O.B. point designated.  The invoice price includes delivery at seller's expense to that location.  Title to goods usually passes from seller to buyer at the FOB location."  Black's Law Dictionary 642 (6th ed. 1990).

[5] The defendants assert in their memorandum of law that Culebra delivered the vessel to Florida.  *See* Motion To Dismiss at 5.  Even assuming *arguendo* that they had properly supported this statement via sworn affidavit or other evidence, for purposes of resolution of the instant motions I would accept Kiernan's evidence that the Lease provided for delivery of the vessel FOB Westport Island, Maine (*continued on next page*)

of the Lease, a fully operational COI. *Id*.[6] The reason Coast Guard inspectors are essential to this case is that a passenger vessel must be inspected regularly by the Coast Guard in the zone in which the vessel operates. Campbell Aff. ¶ 13.

Despite the fact that Culebra complied with all of its obligations under the Lease, River Cruises has not paid Culebra the rent that was due in Maine under the Lease by January 1, 2007. Kiernan Decl. ¶ 20. Campbell, the personal guarantor of the Lease, has also failed to pay the rent. *Id.* River Cruises as lessee and Campbell as guarantor both have claimed incorrectly that the January lease payment was not made because the vessel could not be safely operated or because the Florida Coast Guard had prohibited its operation. *Id*. ¶ 21. To respond to these claims, Culebra will need testimony from Thomas M. Farrell of Thomas M. Farrell Naval Architects, Inc. in Newcastle, Maine, the registered naval architect and professional engineer who submitted the design of the vessel to the Coast Guard. *Id*. ¶ 22. Culebra will also need testimony from several of the Coast Guard personnel in Maine who originally issued the COI, Coast Guard personnel in Washington, D.C., who approved the vessel's design, the Marine Surveyor, Theriault, whose office is located in Yarmouth, Maine, and various subcontractors who were involved in the vessel's construction, all of whom reside in Maine. *Id*.[7]

---

and that this in fact was how the vessel was delivered. *See* Kiernan Decl. ¶ 16; Lease at 3, ¶ 12.

[6] Campbell states that the Black Prince only provisionally passed its Florida Coast Guard inspection and that, after Kiernan came back to Florida to attempt to correct the deficiencies, the vessel was issued a temporary operational certificate subject to operational restrictions. *See* Campbell Aff. ¶ 14. He further asserts that (i) the Coast Guard found exceptions to the vessel's gasoline engine configuration and denied it permission to operate as intended until various changes were made by the plaintiff, (ii) the Coast Guard denied permission to fire the canon onboard the Black Prince, (iii) the Black Prince was not allowed to operate as intended, as a pirate-ship attraction, and (iv) after several attempts to resolve the dispute, Campbell found out that the Coast Guard had determined that the operational restrictions would not be lifted. *See id*. ¶¶ 16-19. The Kiernan affidavit contradicts these statements, at least in part. While Kiernan does not assert that the vessel was permitted to operate as a pirate-themed ship as intended, complete with firing cannon, he does state that at all relevant times the vessel had a fully operational COI and was never prohibited by the Coast Guard in Florida from carrying passengers. *See* Kiernan Decl. ¶ 19.

[7] Campbell describes Kiernan as "[t]he only witness that is not located in Florida[.]" Campbell Aff. ¶ 9. For purposes of resolution of (*continued on next page*)

The vessel currently is located in Palm Beach, Florida. *Id*. ¶ 23. Culebra had the vessel seized and the locks changed. Campbell Aff. ¶ 18. Culebra is attempting to mitigate its damages by seeking opportunities to operate it as a passenger vessel. Kiernan Decl. ¶ 23. Because Kiernan has nobody else to take on the effort of setting the vessel up as a passenger vessel or seeking other potential buyers, he reluctantly must spend much of his time in Palm Beach, a severe financial strain on his business and family. *Id*. As a result, when the weather becomes more conducive to operating a pirate-themed cruise vessel in Maine, Culebra may move the vessel back to Maine. *Id*.

Campbell, a resident of County Cork, Ireland, has never been to Maine. Campbell Aff. ¶¶ 3-4. Campbell is a principal in River Cruises, a Florida limited liability company. *Id*. ¶ 5. All employees and officers of River Cruises, as well as the vessel itself and the Florida Coast Guard inspectors involved in this case, reside or are located in Fort Lauderdale, Florida, which is in the Southern District of Florida. *Id*. ¶ 7. It would be very expensive, difficult if not impossible and burdensome to bring all of the witnesses, in particular the Coast Guard inspectors, to the District of Maine to testify at trial in this matter. *Id*. ¶ 8. While it appears that the plaintiff signed the Lease in Maine, Kiernan Decl. ¶¶ 11-12, River Cruises executed it in Florida, Campbell Aff. ¶ 11. The vessel was inspected in Florida. Campbell Aff. ¶ 11.

### III. Discussion

#### A. Personal Jurisdiction

In diversity cases the exercise of personal jurisdiction over a nonresident defendant is governed by the forum state's long-arm jurisdiction statute. *See, e.g., American Express Int'l, Inc. v. Mendez-Capellan*, 889 F.2d 1175, 1178 (1st Cir. 1989). Maine's long-arm jurisdiction statute

---

the instant motions, I resolve this factual dispute in the plaintiff's favor.

declares that it is to be applied "so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment."  14 M.R.S.A. § 704-A(1).  Therefore, on a motion to dismiss for lack of personal jurisdiction, this court's inquiry focuses on whether the assertion of  jurisdiction violates due process.  *See, e.g., Archibald*, 826 F. Supp. at 29.[8]

A court may have general or specific personal jurisdiction over the defendants in an action.  General jurisdiction arises when the defendant has engaged in substantial or systematic and continuous activity, unrelated to the subject matter of the action, in the forum state.  *See, e.g., Scott v. Jones*, 984 F. Supp. 37, 43 (D. Me. 1997).  Specific jurisdiction is based on a relationship between the forum and the particular acts or injuries that provide the basis for the action, that is, "where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts."  *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088-89 (1st Cir. 1992).  The plaintiff relies on establishment of the requisites of specific jurisdiction.  *See* Opposition at 3.

The First Circuit tests the appropriateness of the exercise of specific jurisdiction via a trifurcated analysis:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities.  Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.  Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*United Elec. Workers*, 960 F.2d at 1089.  The "Gestalt factors," in turn, comprise

---

[8] As the defendants observe, *see* Motion To Dismiss at 8-9, while there are differences between the phrasing of the Law Court's due-process test for exercise of personal jurisdiction over a nonresident defendant and that of the First Circuit, those differences have been described as "purely semantic[,]" *Telford Aviation, Inc. v. Raycom Nat'l, Inc.,* 122 F. Supp.2d 44, 46 n.3 (D. Me. 2000).  Accordingly, I follow the test laid out by the First Circuit.

(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Id*. at 1088.  As this court has observed:

When a plaintiff succeeds in demonstrating relatedness and purposeful availment, the court's exercise of jurisdiction over the person of the defendant is proper unless the defendant can establish that certain gestalt factors would make the exercise of jurisdiction offensive to our traditional notions of fair play and substantial justice. Alternatively, if the plaintiff's showing on relatedness and purposeful availment is close but non-convincing, a strong showing by the plaintiff on the gestalt factors may tip the scale in favor of exercising jurisdiction over the defendant.

*Halkett v. Golden*, Civil No. 05-110-B-C, 2006 WL 1720124, at *3 (D. Me. June 19, 2006) (citations and internal quotation marks omitted).

## 1.  Relatedness

In analyzing "relatedness" with respect to contract causes of action, a court "must look to the elements of the cause of action and ask whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach."  *Phillips Exeter Acad. v. Howard Phillips Fund, Inc*., 196 F.3d 284, 289 (1st Cir. 1999).  The defendants point out, *inter alia*, that neither Campbell nor any River Cruises officer has ever set foot in Maine.  *See* Motion To Dismiss at 5.  Nonetheless, lack of physical presence within the forum is not dispositive; "[t]he transmission of information into [the forum state] by way of telephone or mail is unquestionably a contact for purposes of [personal jurisdiction] analysis."  *Scott*, 984 F. Supp. at 44 (citation and internal quotation marks omitted); *see also, e.g., United States v. Swiss Am. Bank, Ltd*., 274 F.3d 610, 622 (1st Cir. 2001) ("When physical presence is lacking, we look for some other indication that the defendant reached into the forum, such as mail or telephone contacts.").

In this case, I have little difficulty concluding that the defendants' contacts with Maine were instrumental in both the formation and the alleged breach of the Lease and the guaranty. While River Cruises executed the Lease in Florida, Campbell conducted extensive negotiations with the Maine-based plaintiff leading to its execution. Campbell initiated contact with Kiernan, whom he quickly discovered resided in Bath, Maine, and transmitted a number of e-mails to Kiernan in Maine over the course of approximately a month and a half to cinch the Black Prince deal. There can be no doubt that Campbell's contacts with Maine in September and October 2006 were instrumental to formation of the Lease and guaranty. Campbell did not wish River Cruises simply to purchase the Black Prince, as Kiernan and Culebra originally had envisioned; instead, he proposed a more complicated lease arrangement with an option to purchase and a personal guaranty, the details of which the parties hammered out via the back-and-forth e-mail exchange between Maine and Florida. *See United Elec. Workers*, 960 F.2d at 1090 ("[C]ourts have found that participating in significant negotiations within the forum state anent important contract terms can constitute 'minimum contacts' with the state for purposes of a subsequent claim asserting breach of that contract.").

With respect to the alleged breach of contract, "a contract arguably is breached where a promisor fails to perform[.]" *Phillips*, 196 F.3d at 291. "Indeed, courts repeatedly have held that the location where payments are due under a contract is a meaningful datum for jurisdictional purposes." *Id*. Here, payments were due at Culebra's offices in Bath, Maine. While "that fact alone does not possess decretory significance[,]" *id*., other factors in this case militate in favor of a finding of "relatedness" of the defendants' Maine contacts to the instant action. These include not only contacts that, as discussed above, were instrumental to formation of the relevant agreements but also the parties' arrangement, per the terms of the Lease, for River Cruises to take delivery of the vessel – the subject matter of the Lease – in Maine. *See Papachristou v. Turbines Inc.*, 902 F.2d 685, 686 (8th

12

Cir. 1990) (location of delivery of engine was material term of contract and established the agreed place of performance).[9]

Culebra accordingly satisfies its *prima facie* burden of demonstrating the relatedness of the defendants' Maine contacts to Culebra's causes of action against them.

## 2.  Purposeful Availment

I turn to the "purposeful availment" requirement, which "protects defendants from jurisdiction based solely on random, fortuitous, or attenuated contacts or the unilateral activity of another party." *Telford Aviation*, 122 F. Supp.2d at 47 (citation and internal quotation marks omitted).  "This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." *Swiss Am. Bank*, 274 F.3d at 624.  The defendants argue that, in this case, their contacts with Maine were merely fortuitous inasmuch as their "first contact with Maine was a response to a website, and involved an inquiry about leasing a boat that would be delivered to and operate exclusively in Florida[,]" and "[o]ther than mailing of payment, there was little if any telephone or mail communication to or from Maine."  Motion To Dismiss at 7.  They cite, *inter alia*, *Architectural Woodcraft Co. v. Read*, 464 A.2d 210 (Me. 1983), in which personal jurisdiction was found lacking over a non-forum defendant who had ordered a spiral staircase from a Maine manufacturer.  *See id*. at 6;  *see also Read*, 464 A.2d at 212-13 ("The only contacts between the

---

[9] The defendants analogize this case to *Telford Aviation*, arguing that (i) "the fact that none of the air-charter services that were [the] subject of a contract [in *Telford Aviation*] involved flights to or from Maine was an important factor in the court's finding of a lack of relatedness to this forum[,]" and (ii) the court "did not consider non-payment to an address in Maine (the breach) as a Relatedness factor[.]"  Motion To Dismiss at 5.  The defendants misconstrue *Telford Aviation*.  The court did not find a lack of relatedness; rather, although it found that the contacts in issue created "a tenuous nexus" between the defendant and the forum, it assumed that the plaintiff had satisfied its burden of making a *prima facie* showing of relatedness.  *See Telford Aviation*, 122 F. Supp.2d at 47.  Further, the court considered the alleged breach irrelevant to purposeful-availment analysis, not to relatedness analysis.  *See id*. & n.4.  In any event, in this case, the plaintiff was not selling a transportation service but rather leasing the item that would be used for transportation – (*continued on next page*)

Defendant and the State of Maine arose from the purchase of the staircase.  There is no allegation by complaint or affidavit that the Defendant ever set foot in Maine or conducted any other business here. The only affiliating circumstances of record in this case are that the Defendant ordered the staircase from the Plaintiff, a firm which was located in Maine, and he communicated with the Plaintiff by telephone and mail with respect to that order.") (citation and internal quotation marks omitted).

In so arguing, the defendants seek to align themselves with a species of defendant known as a "passive purchaser" – that is, a buyer whose only real contact with a forum state is to order a product from a forum-state seller and await its arrival.  *See Bond Leather Co. v. Q.T. Shoe Mfg. Co.*, 764 F.2d 928, 933 (1st Cir. 1985).  Such a nonresident purchaser has not "purposefully availed" itself of the privilege of doing business in the forum in the sense that it has made "a purposeful decision . . . to 'participate' in the local economy and to avail itself of the benefits and protections of the forum." *Bond Leather*, 764 F.2d at 934; *see also, e.g., Cole v. McGuire Bros. Constr., Inc*., No. Civ. A. 05-678(MLC), 2005 WL 3077902, at *4 (D.N.J. Nov. 15, 2005) ("Jurisdiction over a non-resident buyer may be proper when the buyer becomes more than a 'passive purchaser.'"); *WPI Elecs., Inc. v. Super Vision Int'l, Inc*., No. C-99-426-B, 2000 WL 1466118, at *5 (D.N.H. Jan. 27, 2000) (observing that First Circuit, among other courts, has expressed "concern about protecting wholly passive purchasers who do no more than place an order with an out of state merchant and await delivery") (citation and internal quotation marks omitted); *Allied Leather Corp. v. Altama Delta Corp*., 785 F. Supp. 494, 500 (M.D. Pa. 1992) (distinguishing transaction in which "the out of state purchaser merely ratif[ies] the terms as presented, for instance, where one orders from the L.L. Bean catalogue," from transaction in

---

the Black Prince – which the plaintiff delivered to the defendants in Maine.

14

which there were "vigorous negotiations – a give and take, where each side haggles over the smallest terms of an intricate agreement.").

Had River Cruises simply bought the Black Prince outright, the defendants might have a stronger argument that River Cruises was, in effect, a passive purchaser. But that is not what transpired. Campbell, responding to an advertisement to sell the vessel, phoned Kiernan, whereupon he learned that Kiernan, his company and the vessel in which Campbell and River Cruises were interested all were in Maine. During September and October 2006 Kiernan and Campbell exchanged approximately forty e-mails during which, at Campbell's request, the parties worked out details of a sophisticated arrangement for River Cruises to lease the vessel for eighteen months with an option to purchase it, remitting a base price and a percentage of sales monthly to Culebra in Maine, with Campbell to guarantee payment to Culebra. Among other things, Campbell requested a suggested *pro forma* for operation of the Black Prince, which Kiernan supplied and which contained detailed projections of net revenues from the proposed Black Prince operation in Florida. Kiernan also supplied an appraisal of the vessel from a Maine appraiser and a COI from the Coast Guard in Maine.

What is more, the Lease ultimately provided for River Cruises to take delivery of the Black Prince FOB Westport Island, Maine (which River Cruises did), for River Cruises to provide a deposit sufficient to return the vessel to Maine in the event of a default, for monthly payments during the term of the eighteen-month contract to be sent to Culebra in Maine, for River Cruises to insure the vessel and add Culebra and a Maine lender, Northeast Bank in Lewiston, as additional insureds, and for the Lease to be subject to and governed by Maine law. Finally, as an integral part of the overall deal, the parties executed a non-competition agreement to assuage Campbell's concerns about having potential customers drawn away should Long Reach sell or lease another vessel similar to the Black Prince in

the Fort Lauderdale vicinity.  That document provided that disputes arising out of that agreement were to be resolved by arbitration in Portland, Maine.[10]

In these circumstances, River Cruises cannot fairly be described as having been a passive purchaser.  Its principal, Campbell, initiated contact with Kiernan in the forum state, actively negotiated a sophisticated set of contracts related to the lease of an expensive and unusual item (a pirate-themed passenger ship), agreed that River Cruises would take delivery of that item in Maine, agreed that Maine law would govern construction of the Lease and contemplated an ongoing, eighteen-month relationship with a Maine company, Culebra, during which River Cruises would remit base rent and a share of pirate-ship-cruise proceeds to Culebra in Maine.  While the Lease did not contain a forum-selection clause providing for resolution of disputes in Maine, a related contract, the non-competition agreement, did.  For his part, defendant Campbell, a principal of River Cruises, not only actively negotiated the transaction with Kiernan but also guaranteed payment to facilitate it. The First Circuit has suggested that, while execution of a guaranty alone is not enough to amount to purposeful availment, execution of a guaranty to facilitate a forum resident's transaction with a nonresident corporation in which the guarantor has a financial interest suffices in circumstances in which the nonresident corporation itself has the requisite contacts with the forum state.  *See Bond Leather*, 764 F.2d at 934; *see also, e.g., Koff v. Brighton Pharm., Inc.*, 709 F. Supp. 520, 526 n.7 (D.N.J. 1988) (noting that First Circuit in *Bond Leather* indicated view that "an agency relationship with, or a

---

[10] The defendants contend that certain contract terms highlighted by the plaintiff, such as the Lease provision contemplating return of the vessel to Maine, are irrelevant because those provisions are not implicated in the current dispute between the parties; for example, the plaintiff seized the vessel in Florida, where it remains, rather than arranging its immediate return to Maine.  *See* Defendants' Reply to Plaintiff's Opposition to Defendants' Motion To Dismiss Pursuant to F.R.C.P. 12(b)(2) and (3) or in the Alternative for a Transfer of Venue Pursuant to 28 U.S.C. §1404(a) ("Reply") (Docket No. 16) at 3.  Nonetheless, in analyzing whether a defendant purposefully availed itself of the privilege of doing business in a forum, it is appropriate to consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing[.]"  *Bond Leather*, 764 F.2d at 935 n.4 (citation and internal quotation marks omitted).

financial interest in, the corporation whose obligations were being guaranteed would amount to the requisite 'supplemental contacts' [beyond execution of the guaranty alone] if the latter corporation had a sufficient relationship of its own with the forum state").

In short, the defendants' actions collectively amounted to "purposeful availment," creating a state of affairs in which it was foreseeable that one or both could be haled into court in Maine in connection with the Lease and/or guaranty. *See, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985) (a choice-of-law provision in a contract "reinforce[s] [the nonresident defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there"); *IBM Corp. v. Merlin Technical Solutions, Inc*., Civil No. 06-40174-FDS, 2007 WL 335258, at *6 (D. Mass. Feb. 1, 2007) (defendant purposefully availed itself of privilege of conducting business in Massachusetts when it (i) knowingly entered into contract with Massachusetts corporation that contemplated ongoing, continuous relationship rather than one-time purchase, (ii) forwarded purchase orders to corporation in Massachusetts on four occasions between 2004 and 2005, (iii) accepted delivery FOB Massachusetts of products that had been manufactured in and shipped from Massachusetts, and (iv) remitted payment for those products pursuant to invoices issued from Massachusetts); *Cole*, 2005 WL 3077902, at *4 ("To the extent the buyer vigorously negotiates, perhaps dictates the contract terms, inspects production facilities, and otherwise departs from the passive buyer role the exercise of jurisdiction over the foreign buyer becomes more reasonable.") (citation and internal quotation marks omitted);[11] *Forum Fin. Group v. President & Fellows of Harvard Coll*., 173 F. Supp.2d 72, 90 (D. Me. 2001) ("Although mere awareness that one's product (or financial payment) will end up in the forum state is not enough to foresee being subject to

---

[11] While the defendants did not travel to Maine to inspect the Black Prince, they were provided a valuation from a Maine surveyor and
(*continued on next page*)

17

jurisdiction there, nevertheless, targeting and initiating an ongoing business relationship with a Maine company evinces an intent to avail oneself of the benefits of the forum state, including participation in the market and access to its courts."); *WPI Elec.*, 2000 WL 1466118, at *6-*7 (plaintiff made *prima facie* showing that defendant was more than mere passive purchaser, and exercise of jurisdiction was appropriate, when it adduced evidence*, inter alia*, that "[t]he parties' contract, which involved the sale of relatively complex products modified to fit the specific requirements of [defendant's] project, was the result of extensive negotiation[,]" and, "[w]hile [defendant] was not physically present in New Hampshire during the negotiation period, it did direct extensive communications, by telephone, fax, and email, into the state.").[12]

The plaintiff makes out a *prima facie* case that the defendants purposefully availed themselves of the privilege of doing business in Maine.

### 3. Reasonableness

"The purpose of the gestalt factors is to aid the court in achieving substantial justice, particularly where the minimum contacts question is very close.  In such cases, the gestalt factors may tip the constitutional balance." *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 717 (1st Cir. 1996). That said, "[t]he gestalt factors rarely seem to preclude jurisdiction where relevant minimum contacts exist." *Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.*, 295 F.3d 59, 66 (1st Cir. 2002).  For reasons that follow, that is the case here:

---

a COI from the Coast Guard in Maine.

[12] The defendants protest, *inter alia*, that they did not purposefully avail themselves of the privilege of doing business in Maine inasmuch as the fact that the vessel and plaintiff happened to be in Maine was meaningless to them; they simply wanted to obtain a vessel to use in operating a pirate-ship attraction in Florida.  *See* Reply at 3-4.  Nonetheless, at Campbell's behest, the parties negotiated a lease and guaranty arrangement that contemplated an eighteen-month-long relationship with the Maine-based plaintiff.

1.     Burden of appearance:  "[T]he concept of burden is inherently relative, and, insofar as staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly . . . this factor is only meaningful where a party can demonstrate some kind of special or unusual burden."  *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994); *see also, e.g., Smirz v. Fred C. Gloeckner & Co.*, 732 F. Supp. 1205, 1208 (D. Me. 1990) (defendant who purposefully directs activities toward Maine shoulders burden of providing compelling evidence why exercise of jurisdiction would be unreasonable).  The defendants argue that "if the forum were to remain in Maine, the burden upon [them] would be substantially higher on [them] than on Plaintiff, because all but one witness, the Vessel and virtually all of the records are in Florida."  Reply at 2.  As an initial matter, the plaintiff has disputed this factual premise, asserting that it will rely on testimony of several Maine-based witnesses besides Kiernan.  In any event, the defendants offer nothing beyond conclusory assertions that the location of the vessel, records and some witnesses in Florida imposes a relatively greater burden on them.  They offer no explanation why, or evidence that, the presence of the vessel itself is critical to trial of this case, critical witnesses are unwilling to travel to Maine or their testimony could not be obtained by other means, or that necessary documents or authenticated copies thereof could not be brought to Maine without undue burden.  They accordingly fail to "demonstrate some kind of special or unusual burden."  *Pritzker*, 42 F.3d at 64.

2.     Interest of the forum:  As to this factor, the court's "task is not to compare the interest of the two sovereigns . . . but to determine whether the forum state has an interest."  *Nowak*, 94 F.3d at 718 (emphasis in original).  Maine has an interest in providing "a convenient forum for its residents to redress injuries inflicted by out-of-forum actors."  *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 62 (1st Cir. 2002) (citation and internal quotation marks omitted).

3.      Plaintiff's convenience:  A court "must accord deference to [a plaintiff's] choice of . . . forum."  *Nowak*, 94 F.3d at 718; *see also, e.g., Scott*, 984 F. Supp. at 46 ("In analyzing personal jurisdiction, the Court does not engage in 'judicial second-guessing' but defers to Plaintiff's choice of forum as the best indicator of his own convenience.") (footnote omitted).  The plaintiff has chosen Maine.

4.      Administration of justice:  "Usually this factor is a wash," *Nowak*, 94 F.3d at 718, and the defendants provide no reason to find otherwise in this case.

5.      Pertinent policy arguments:  This "factor addresses the interests of the affected governments in substantive social policies."  *Id*. at 719.  Here, as in *IBM*, "there is no public policy reason disfavoring the exercise of jurisdiction."  *IBM*, 2007 WL 335258, at *8.  The plaintiff, a Maine corporation, did not engage in inappropriate forum-shopping, and the Lease's choice-of-law provision specifies application of Maine law.  *See id*.

Consideration of the Gestalt factors accordingly does not counsel against this court's exercise of personal jurisdiction over the defendants.

## B.  Propriety of Venue

In a diversity case such as this, venue is proper, *inter alia*, in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred[.]"  28 U.S.C. § 1391(a).  The "substantial part" test asks "whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts[.]"  *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001) (citations and internal quotation marks omitted).

The defendants acknowledge that "[w]hen a defendant's connection to a forum passes the 'relatedness' test for purposes of personal jurisdiction, it passes the 'substantial part' test for purposes of venue."  Reply at 5.  They argue that venue is improper inasmuch as their contacts with Maine do

not meet the relatedness test, *see id.*; however, for reasons discussed above, I have determined that the converse is true.  Venue accordingly is proper in Maine.

## C. Discretionary Transfer of Venue

The evidence submitted by a defendant seeking transfer pursuant to 28 U.S.C. § 1404(a) "must weigh heavily in favor of transfer" when the forum in question is the plaintiff's "home forum." *Demont*, 77 F. Supp.2d at 173.  The defendants' arguments, which I address *seriatim*, are not sufficiently weighty to displace the plaintiff's choice of forum:

1.  <u>Convenience and relative financial strength of parties</u>: That inasmuch as (i) the plaintiff is "a corporation that has a presence all over the country in light of its advertising practices[,]" (ii) its principal travels to Florida, (iii) the defendant corporation is a Florida-based company, and (iv) the individual defendant is a resident of Ireland who has never been to Maine, venue in Maine would be highly inconvenient for the defendants and not particularly inconvenient for the plaintiff.  *See* Motion To Transfer at 12.  While the defendants profess inconvenience, they submit no evidence concerning their financial strength.  One cannot reasonably infer that the plaintiff's placement of advertisements in publications distributed nationally bespeaks an ability to absorb costs of traveling nationwide.  While the plaintiff, like the defendants, discloses no details as to its financial strength, it does adduce evidence that Kiernan, its sole member, traveled to Florida to help mobilize the vessel only on an expenses-paid basis, and that his trips to Florida since that time to mitigate damages flowing from non-payment pursuant to the Lease and guaranty have worked a hardship on himself and his family.  Transfer will not be ordered "if the result is merely to shift the inconvenience from one party to the other."  *Banjo Buddies, Inc. v. Renosky*, 156 F. Supp.2d 22, 26 (D. Me. 2001) (citation and internal quotation marks omitted).  On the showing made, that would be the case were the instant action to be transferred to Florida.

2.    <u>Location of evidence</u>: That all evidence is located in Florida, including the vessel that is the subject of this action. *See* Motion To Transfer at 12. The defendants offer no detail with respect to any documentary evidence and do not explain why, for purposes of defending this action, the vessel need be present in the forum in which the case is to be litigated. Nor is this otherwise self-evident. "[A]morphous allegations of inconvenience regarding unspecified documents, as with unnamed witnesses, are inadequate to satisfy the required clear showing of balancing of conveniences[.]" *Ashmore*, 925 F. Supp. at 39.

3.    <u>Convenience, availability of witnesses</u>: That the defendants have demonstrated this factor tilts in their favor by specifying key witnesses to be called and generally describing the testimony those witnesses are expected to offer. *See* Motion To Transfer at 12-13. Campbell identifies unnamed employees and officers of River Cruises, as well as Coast Guard inspectors, as witnesses residing in Florida who will be called in this case. *See* Campbell Aff. ¶¶ 7-8. He explains that the testimony of the Coast Guard inspectors is essential because "a passenger vessel must be inspected regularly by the Coast Guard in the zone in which the vessel operates." *Id*. ¶ 13. He further states: "It would be very expensive, difficult if not impossible, and burdensome to bring all of the witnesses, and in particular the Coast Guard inspectors, to the District of Maine to testify at trial in this matter." *Id*. ¶ 8.

Witness inconvenience is not in itself a sufficient basis on which to upset a plaintiff's choice of forum. *See, e.g., Demont*, 77 F. Supp.2d at 174 ("While it would undoubtedly be more convenient for Defendant – and many of the witnesses – if this action were tried in Vermont, more is required before this Court will disturb Plaintiff's choice of this forum."). In their initial motion, the defendants do not explain why, apart from expense, it would be "difficult if not impossible" to bring their witnesses to Maine. *See* Motion To Transfer at 12-13. In their reply, they suggest concern that their witnesses are

22

beyond the reach of this court's subpoena power, asserting that none "can be compelled to a deposition in Maine."  Reply at 6.  For purposes of transfer-of-venue analysis, River Cruises' own employees and officers are deemed to be within its control.  *See, e.g., Idlewild Creek Ltd. P'ship v. Travelers Prop. Cas.*, No. 00-200-P-C, 2000 WL 1717566, at *2  (D. Me. Nov. 16, 2000) ("Of the witnesses listed, two are employees of the defendant and two are consultants to the defendant.  Such witnesses must be deemed to be within the defendant's control for purposes of a section 1404(a) analysis; they may be physically located outside the 100-mile limit for service of subpoenas imposed by Fed.R.Civ.P. 45(b)(2), but the fact that they are not within the range of this court's subpoena power is irrelevant when they are within the defendant's control.").

That is not true of any Florida-based Coast Guard witnesses, whose testimony indeed appears to be material to defense of this case.  Nonetheless, the defendants have not shown that these unnamed witnesses are unwilling to travel to Maine or that there are no alternative, less burdensome means by which to present their testimony.  *See Citigroup Inc. v. City Holding Co.*, 97 F. Supp.2d 549, 561-62 (S.D.N.Y. 2000) (observing, "It would be preferable for [defendant] to have the benefit of live witness testimony on a significant issue such as actual confusion, and presumably the witnesses identified by [defendant] are not subject to the reach of this Court's subpoena power.  However, the unavailability of process over third-party witnesses does not compel transfer when the practical alternative of offering videotaped or deposition testimony of a given witness exists."; noting that defendant had not suggested that testimony could not be presented in some alternative form at trial or that the two third-party witnesses it had identified would be unwilling to testify in New York absent compulsion of subpoena) (footnote omitted).

To the extent the defendants claim inconvenience on the ground of the expense of transporting witnesses to Maine, they fall short of making a persuasive showing.  They do not identify specific

witnesses by name, explain how many witnesses are necessary or estimate the cost of their appearance and its impact on them given their relative financial strength.

4.    <u>Relative congestion of dockets</u>. The defendants concede that this factor does not militate in favor of transfer, arguing instead that it does not, standing alone, prevent transfer. *See* Motion To Transfer at 13.

The evidence submitted by the defendants, considered as a whole, falls short of weighing heavily in favor of transfer.

## IV.  Conclusion

For the foregoing reasons, I recommend that both the Motion To Dismiss and the Motion To Transfer be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 4th day of June, 2007.

<u>/s/ David M. Cohen</u>
David M. Cohen
United States Magistrate Judge

24