## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **CULEBRA II, LLC,** | ) | |
| | ) | |
| **PLAINTIFF** | ) | |
| | ) | |
| **v.** | ) | **CIVIL NO. 07-13-P-H** |
| | ) | |
| **RIVER CRUISES AND** | ) | |
| **ANTICIPATION YACHTS, LLC,** | ) | |
| **ET AL.,** | ) | |
| | ) | |
| **DEFENDANTS** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a lawsuit over a "pirate ship" lease.  I conducted a bench trial on June 19, 2008.  These are my findings of fact and conclusions of law.

### FINDINGS OF FACT

1.      Culebra II, LLC ("Culebra II") is a company organized under the laws of Maine, with its principal place of business in Bath, Maine.  Michael Kiernan ("Kiernan") is the sole member of Culebra II.[1]

2.      Culebra II owns the "BLACK PRINCE," a vessel designed to resemble a pirate ship and to carry passengers on pirate-themed excursions.

3.      Culebra II obtained a certificate of inspection from the United States Coast Guard in Portland, Maine ("USCG Portland") that contained no operational restrictions.

---

[1] Kiernan also controls a separate entity, Long Reach Marine Group, LLC (d/b/a Long Reach Cruises) ("Long Reach Marine Group").

4.     Culebra II operated the BLACK PRINCE in Maine waters in 2005 and 2006.  During part of that time, the BLACK PRINCE carried and fired a yacht signal cannon as part of its pirate-themed excursions.

5.     River Cruises and Anticipation Yachts, LLC ("River Cruises") is a company organized under the laws of Florida, with its principal place of business in Fort Lauderdale, Florida.   James Campbell ("Campbell") is a member of River Cruises.

6.     Culebra II and River Cruises signed a lease on October 26, 2006, for the BLACK PRINCE—described in the lease as "One Pirate Ship Theme Passenger Vessel Official Number 1172141 . . . .   Including all necessary equipment to comply with [United States Coast Guard] Certificate of Inspection dated 22, June 2005."  Other relevant terms of the lease include:

(a)     The lease term was from November 1, 2006 to March 31, 2008;

(b)     River Cruises agreed to pay Culebra II a base monthly rent of $3,700, due the first day of each month, plus five percent of the prior month's gross sales for the BLACK PRINCE;

(c)     River Cruises agreed to pay a penalty of five percent on lease payments more than 10 days overdue;

(d)     River Cruises agreed to obtain the necessary certificate of inspection from the local USCG and Culebra II agreed to provide all the necessary documentation and original equipment for that certification;

(e)     Before either party takes legal action based on a lease default, it must first provide a written "fair notice" delivered by U.S. Certified Mail that explains the nature of the default and it must give the other party at least ten days to cure the default;

(f)     In the event of a payment default, Culebra II reserved the right to declare immediately due all remaining monthly payments under the lease, terminate the lease, and take possession of the vessel.

2

7. The lease contains no reference to a cannon.

8. Campbell personally guaranteed the lease on behalf of River Cruises.

9. River Cruises provided Culebra II a Security Deposit of $12,450 and a Return Transportation Deposit of $6,500.

10. In a transaction separate from the lease, Kiernan, through Long Reach Marine Group, offered to sell to River Cruises the yacht signal cannon and certain pirate paraphernalia (e.g., eye-patches, pirate hats). The cannon transaction was never completed, because by the time River Cruises confirmed its desire to purchase the signal cannon, the vessel had left Maine, and Kiernan had no other way to ship the signal cannon.[2]

11. In accordance with the lease terms, Culebra II delivered the BLACK PRINCE to River Cruises at Westport Island, Maine. River Cruises transported the vessel by truck to Fort Lauderdale.

12. River Cruises and Long Reach Marine Group agreed that Kiernan would assist in preparing the BLACK PRINCE and training its crew for Florida operations. Pursuant to that agreement, River Cruises agreed to compensate Long Reach Marine Group $395 per day plus expenses.

13. River Cruises applied to the USCG in Miami, Florida ("USCG Miami") for a certificate of inspection for the BLACK PRINCE. USCG Miami expressed concern over the configuration of the fuel tanks and the use of an outboard, gasoline engine. As a result, USCG Miami issued a certificate of

---

[2] River Cruises later purchased a "standard black Winchester cannon" from a different source.

inspection with an operational restriction that prevented open flames aboard the BLACK PRINCE.

14.   USCG Miami's operational restrictions did not prevent the BLACK PRINCE from carrying paying passengers.   There is no evidence that the restriction on open flames prevented the operation of the type of yacht signal cannon[3] used aboard the BLACK PRINCE when it was in Maine (or, for that matter, the type of Winchester cannon purchased by River Cruises).

15.   Culebra II sought clarification from USCG Miami regarding the equipment concerns with the BLACK PRINCE; Culebra II arranged a conference call with USCG Portland and USCG Miami to discuss the safety issues.

16.   During December 2006, Culebra II undertook modifications (principally reconfiguring the fuel tanks) at its own expense to bring the BLACK PRINCE into compliance with USCG Miami's requirements.   The goal of these modifications was to remove the operational restrictions from the certificate of inspection.

17.   On December 28, 2006, Campbell told Kiernan by email that he did not think the BLACK PRINCE was working for River Cruises in Fort Lauderdale.   He suggested that Culebra II sell the BLACK PRINCE to a prospective buyer.

---

[3] Kiernan testified that a yacht signal cannon, approximately eighteen inches, takes a blank shotgun shell, which is then discharged by striking with a wooden mallet.

18.   River Cruises made monthly lease payments on the BLACK PRINCE for only November and December 2006.[4]

19.   For January 2007, a check was prepared by River Cruises in the amount of $3,569.06 for the BLACK PRINCE's monthly lease payment (based on River Cruises's unilateral reduction to reflect certain days when the vessel was undergoing modifications) and five percent of the prior month's sales, but that check was never received by Culebra II and there is no evidence that it was sent.

20.   On January 11, 2007, Culebra II sent River Cruises a notice of default by certified mail, stating that the full monthly lease payment of $3,700 plus a late fee of $185 must be paid within ten days of the date the notice was mailed.  River Cruises received that notice on January 17, 2007.

21.   Culebra II sent a "final notice of default" to River Cruises by email on January 26, 2007.

22.   River Cruises did not respond to the January 11, 2007 notice until January 26, 2007.[5]

23.   Also on January 26, 2007, Kiernan secured the BLACK PRINCE to the dock in Fort Lauderdale with a lock and cable; and he notified USCG Miami that Culebra II had repossessed the BLACK PRINCE and requested termination of the certificate of inspection issued to River Cruises.

---

[4] On October 26, 2006, River Cruises paid $2,220, which the parties agreed was the proper prorated monthly payment for November 2006.  On December 5, 2006, River Cruises made a lease payment of $3,700 and a separate payment of $66.04 for five percent of its sales in the prior month.

[5] River Cruises does not dispute that the notice and opportunity to cure given by Culebra II complied with the requirements of the lease.

24.    After repossessing the BLACK PRINCE, Kiernan noticed damage and unauthorized alterations to the vessel caused by River Cruises.  Kiernan transported the BLACK PRINCE to a self-help dry dock in West Palm Beach, Florida, where he performed repairs and engine modifications.

25.    After repossessing the vessel and making the repairs, Kiernan contacted various entities that had expressed interest in purchasing the BLACK PRINCE.  Culebra II marketed the BLACK PRINCE in numerous trade publications and on the Internet; it also engaged a broker to assist in marketing.

26.    The BLACK PRINCE operated periodically in Florida until July 2007 under the corporate entity Long Reach Pirates of Palm Beach, LLC—an entity created by Kiernan in Florida—but it generated no net profits from those operations.

27.    Culebra II has been unable to sell the BLACK PRINCE; it remained on the market as of June 19, 2008.

28.    As a result of the default by River Cruises, Culebra II incurred lost revenues under the lease consisting of the base rent ($3,700 per month) for the remaining life of the lease, January 2007 to March 2008 (a total of $55,500) and the monthly participation fee of five percent of gross sales.

29.    Under the lease, a five percent late fee is due on each of the outstanding monthly lease payments, which equals $2,775 for fifteen months of late payments.

30.     Upon repossession, Culebra II incurred the following costs that the lease allocates to River Cruises for the entire term of the lease: storage, docking, and transportation costs of $17,066.54 and insurance costs of $8,005.79.

31.     Culebra II paid $2,989.46 owed by River Cruises to Long Reach Marine Group for the services provided by Kiernan to prepare the BLACK PRINCE and train its crew in Fort Lauderdale.

## CONCLUSIONS OF LAW

1.     Jurisdiction is based upon diversity of citizenship.  28 U.S.C. § 1332 (2006).  The lease provides, and the parties agree, that Maine law applies.

### (A)  Culebra II's Claims for Breach of Lease and Breach of Guarantee

2.     River Cruises defaulted under the lease when it failed to make its monthly lease payment for January 2007.  Culebra II's notice of default complied with the lease terms.  River Cruises did not cure its default.

3.     River Cruises was not excused from performing its obligation to make lease payments.  River Cruises attempts to justify its payment default on the ground that Culebra II did not satisfy its obligation under the lease to deliver a vessel capable of operating in Florida as a "Pirate Ship Theme Passenger Vessel" with a cannon, as a result of USCG Miami's restriction on open flames aboard the BLACK PRINCE.[6]  But River Cruises does not explain

---

[6] River Cruises is not clear whether its argument is that the lease required Culebra II to deliver the BLACK PRINCE with a cannon already aboard or simply that the lease required the BLACK PRINCE to have the ability and USCG certification to allow River Cruises to operate its own *(continued on next page)*

how USCG Miami's operational restriction on open flames actually prevented use of a cannon.  Moreover, River Cruises provided no evidence that the lease language "Pirate Theme Passenger Vessel" necessarily included the ability and certification to operate a cannon, or that the BLACK PRINCE, as delivered, otherwise failed to perform as promised in the lease.

In any event, a party to a lease is not automatically excused from performance whenever the other party breaches the lease; only a "material breach" justifies the non-breaching party's subsequent failure to perform.  See Associated Builders, Inc. v. Coggins, 722 A.2d 1278, 1280 (Me. 1999); Down East Energy Corp. v. RMR, Inc., 697 A.2d 417, 421 (Me. 1997).[7]  USCG Miami never prevented the BLACK PRINCE from carrying passengers and there is no evidence that the restrictions by USCG Miami hampered the revenue-generating ability of the BLACK PRINCE.  Additionally, Culebra II made good faith efforts in a timely manner to cure the problems identified by USCG Miami.

4.     Culebra II therefore was entitled to repossess the vessel and now may collect available damages.

---

cannon aboard.  As to the former, the lease does not require Culebra II to equip the BLACK PRINCE with a cannon and the subsequent negotiations between Long Reach Marine Group and River Cruises for the sale of a yacht signal cannon, along with River Cruises's separate purchase of a Winchester cannon, are wholly inconsistent with such an interpretation of the lease.

[7] Five factors are significant to determine whether a breach was "material": "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform . . . will suffer forfeiture; (d) the likelihood that the party failing to perform . . . will cure his failure . . .; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."  Associated Builders, Inc., 722 A.2d at 1280 (quoting Restatement (Second) of Contracts § 241 (1981)).

5.     The defendants do not contest the enforceability of Campbell's personal guarantee; Campbell is personally liable for all amounts that River Cruises owed Culebra II under the terms of the lease.

### (B)  Counterclaims by River Cruises

6.     River Cruises counterclaims for breach of contract, breach of express warranty, and breach of implied warranty based on the same argument that it presents as an affirmative defense:  that the BLACK PRINCE did not satisfy the terms of the lease, which required a vessel able to operate in Florida as a "Pirate Ship Theme Passenger Vessel" with a cannon.  That counterclaim fails for the same reasons that the affirmative defense fails.

Moreover, River Cruises did not comply with the lease requirement that a "fair notice" of default be delivered to the opposing party before any legal action is taken.[8]

7.     River Cruises also asserts a counterclaim for negligent misrepresentation, alleging that Culebra II was negligent because it "knew, or should have known," that the BLACK PRINCE would not be operational as a "Pirate Ship Theme Passenger Vessel" in Florida.  The Maine Law Court has adopted the standard for negligent misrepresentation from the Restatement (Second) of Torts:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the

---

[8] With regard to River Cruises's counterclaim for breach of implied warranty, it also has not established grounds for setting aside the clause in the lease that states:  "No other warranties, express or implied, are made by lessor, including any warranties of merchantability of fitness for purpose."  (emphasis removed).

> guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, *if he fails to exercise reasonable care or competence in obtaining or communicating the information.*

Rand v. Bath Iron Works Corp., 832 A.2d 771, 774 (Me. 2003) (quoting Restatement (Second) of Torts § 552(1)) (emphasis in original).

River Cruises has not identified an instance of false information provided by Culebra II. Culebra II never represented that the BLACK PRINCE would satisfy all of USCG Miami requirements for certification without operational restrictions, or even that the BLACK PRINCE would specifically be allowed by USCG Miami to fire a cannon or have open flames aboard. The lease itself represents only that Culebra II would provide all the necessary documentation and original equipment to attain a certificate of inspection from USCG Miami for the BLACK PRINCE.

River Cruises also fails to demonstrate a lack of reasonable care or competence by Culebra II. Culebra II could reasonably be surprised by USCG Miami's concerns with the configuration of the BLACK PRINCE's fuel tanks, particularly because USCG Portland had not expressed those concerns when it inspected the BLACK PRINCE and issued a certificate of inspection for Maine. River Cruises provides no basis to find that Culebra II knew or should have known that USCG Miami would impose more stringent requirements than USCG Portland.[9]

---

[9] Culebra II's motion in limine to exclude evidence of River Cruises's damages is moot because River Cruises has not established a basis for liability against Culebra II.

10

### (C) Damages

8.    "The purpose of compensatory damages in a contract case is to put the victim of a breach in the same position it would have occupied had there been no breach." Down East Energy Corp. v. RMR, Inc., 677 A.2d 1070, 1073 (Me. 1996).   The "reasonable certainty" standard applies to compensatory damages: "[D]amages are not recoverable when uncertain, contingent, or speculative.   Damages must be grounded on established positive facts or on evidence from which their existence and amount may be determined to a probability.   They must not rest wholly on surmise and conjecture." Michaud v. Steckino, 390 A.2d 524, 530 (Me. 1978); Andrew M. Horton & Peggy L. McGehee, Maine Civil Remedies § 4-3(b)(2) (2004).

The payment default and failure to respond to the notice of default by River Cruises entitled Culebra II to repossess the BLACK PRINCE, accelerate the payments due for the entire life of the lease, charge a five percent late payment penalty, and incur collection costs.   Thus, Culebra II is entitled to the following damages:

(a)    Base rent ($3,700 per month) for the remaining life of the lease, January 2007 through March 2008: $55,500.00;

(b)    A five percent (5%) late fee on each of the outstanding monthly lease payments:  $2,775.00;

(c)    Costs incurred to store, dock, and transport the BLACK PRINCE upon repossession: $17,066.54; and

(d)    Insurance costs through March 2008:  $8,005.79.

Culebra II also is entitled to recover $2,989.46 for bills it paid on behalf of River Cruises for Kiernan's services through Long Reach Marine Group to

prepare the BLACK PRINCE and train its crew in Fort Lauderdale.  Culebra II stated in its final notice of default to River Cruises:

> You have an outstanding bill for services to the vessel from Long Reach Marine Group, LLC.  This bill is overdue thereby *risking lien attachment*.  If you do not pay this bill in full by 10 days from the date of this letter, Culebra II, LLC will pay this expense on your behalf and add it to the total amounts owed under this lease agreement.

Ex. 48 (emphasis added).  The lease requires River Cruises to "keep the [BLACK PRINCE] free and clear of all levies, liens, and encumbrances" and permits Culebra II to pay any sums owed by River Cruises "under the provisions of [the] lease" or "to maintain the Equipment or Tools or any part thereof" and then demand repayment from River Cruises.  Ex. 11, pt.2, ¶¶ 9, 13.  "The payment by [Culebra II] of any such sum . . . shall be prima facie evidence of the necessity therefor."  Id., ¶ 13.  River Cruises has not attempted to rebut the evidence that this payment by Culebra II was necessary to prevent encumbrance of the BLACK PRINCE by a lien from Long Reach Marine Group.

Culebra II may not collect the "participation fee"—its five percent share of the monthly gross sales for the BLACK PRINCE.  River Cruises had no sales once Culebra II locked the vessel to the dock; the lease does not guarantee any amount for the participation fee; and Culebra II has not provided a reliable basis for its estimates.[10]  Culebra II's estimates of $1,736 per month for the participation fee are based on an expectation of the BLACK PRINCE's revenue-

---

[10] Culebra II's estimates derive from Campbell's statement at his deposition that he expected to earn net revenue greater than $2,000 per month on the boat.  Culebra II started with that figure and then computed the gross sales required to generate $2,000 per month net revenue, using estimates of expenses based on its own experience and knowledge gained in Florida.

generating ability in the Fort Lauderdale market that is belied by the actual facts in this case:   (1) five percent of the actual revenues generated in November 2006 was $66.04; (2) five percent of the actual revenues generated in December 2006 was $46.46; (3) the forecast of River Cruises was that it did not think the BLACK PRINCE was going to work in its Fort Lauderdale market; and (4) Kiernan, under the entity Long Reach Pirates of Palm Beach, LLC, did not generate any net profits from operating excursions aboard the BLACK PRINCE in Florida during 2007.

Culebra II also does not provide sufficient evidence to recover repair costs to the BLACK PRINCE upon repossession.  It provided no explanation for these charges beyond testimony that River Cruises caused some damage to the main deck by improperly installing a gangway and to one of the navigation lights by a docking accident.   This testimony is insufficient evidence to support $13,183.65 in repair costs.[11]

A party who suffers losses pursuant to a contract has an affirmative obligation to mitigate any damages.  See Schiavi Mobile Homes, Inc. v. Gironda, 463 A.2d 722, 724–25 (Me. 1983).  "The touchstone of the duty to mitigate is reasonableness.  The nonbreaching party need only take reasonable steps to minimize his losses; he is not required to unreasonably expose himself to risk, humiliation or expense."  Id. at 725.

---

[11] The evidence of damages during the bench trial came from Kiernan's testimony; the underlying records were not admitted, except for a single summary sheet that was admitted solely as a demonstrative exhibit, Ex. 52.

After repossessing the vessel, Culebra II put the BLACK PRINCE back on the market with various direct and indirect marketing strategies.   Culebra II also incurred the expense to upgrade the BLACK PRINCE, making it more attractive to potential buyers.   A new corporate entity was established, Long Reach Pirates of Palm Beach, LLC, to operate the BLACK PRINCE for excursions.   These were reasonable efforts to mitigate the damages caused by River Cruises.

As a result, the net damages to be awarded after subtracting the deposits are $67,386.79.

**Calculation of Damages**

| | |
|---|---|
| Monthly Base Lease Payments (January 2007 - March 2008) | $ 55,500.00 |
| Five Percent Late Penalty on Monthly Base Lease Payments | 2,775.00 |
| Docking, Storage, and Transportation Costs | 17,066.54 |
| Insurance Costs through March 2008 | 8,005.79 |
| Services Provided by Long Reach Marine Group | 2,989.46 |
| Security Deposit | (12,450.00) |
| Return Transportation Deposit | (6,500.00) |
| **Total Damages**<br>**(exclusive of interest, collection costs, and attorneys fees)** | **$ 67,386.79** |

In addition, Culebra II may seek collection costs and attorney fees by filing a motion under Local Rule 54.2, because the lease provides that the losing party agrees to pay "reasonable costs and expenses incurred . . . as determined by the court . . . including attorneys' fees and the value of time lost by the prevailing party or any of its employees in preparing for or participating in any . . . litigation."   The lease also allows the recovery of interest on "any

14

monies . . . owed under [its] terms," along with costs and legal fees, in the amount of eighteen percent.[12]

### (D)  Miscellaneous Evidentiary Rulings

9.  *Deposition of James Campbell.*  River Cruises moved for admission of Campbell's deposition pursuant to Fed. R. Civ. P. 32.  Campbell, a resident of Ireland and a named defendant in this action, did not appear for the bench trial held on June 19, 2008, although he was an expected witness for both parties.

Fed. R. Civ. P. 32 allows a party to submit its own deposition if, *inter alia*, the witness is outside of the United States, "unless it appears that the witness's absence was procured by the party offering the deposition."  Fed. R. Civ. P. 32(a)(4).  When a party requests admission of its own deposition due to unavailability, the burden is on that party to demonstrate that it has not procured its own absence.  See Fairfield 274–278 Clarendon Trust v. Dwek, 970 F.2d 990, 995 (1st Cir. 1992); 7 James Wm. Moore, Moore's Federal Practice § 32.24[5] (2006).

On May 7, 2008, United States Magistrate Judge John H. Rich III issued a final pretrial order that required the parties to provide each other by May 14, 2008, all depositions expected to be presented at trial, to edit those depositions, and to resolve (or present to the court) all objections to those depositions "prior to the commencement of trial."  Rpt. of Final Pretrial

---

[12] Culebra II separately requests "finance charges" stemming from its use of various credit lines to fund expenditures on the BLACK PRINCE incurred as a result of the default by River Cruises.  These "finance charges" are not recoverable because they duplicate the interest provided by the lease.

Conference and Order, at 5–6 (Docket Item 38).  Failure to comply with the terms of that pretrial order could result in "the exclusion of evidence at trial." Id. at 6.  The defendants did not designate the Campbell deposition, although other depositions were designated in accordance with the final pretrial order.

Campbell explains his absence from the trial with a vague and unsubstantiated claim of financial hardship.  Campbell informed his counsel six days before trial that he would not make the trip to Maine, but there is no explanation of any event after May 14, 2008 (the deadline for designating depositions for trial) regarding Campbell's finances (or any other aspect of his life) that caused his unavailability.  The defendants therefore have failed to justify their violation of the pretrial order and do not meet their burden for admission of the deposition under Fed. R. Civ. P. 32 by showing that Campbell did not procure his own absence.  The objection to admission of Campbell's deposition is sustained.

10.  *Parol Evidence and Evidence of Post-Lease Modifications.*  Culebra II objects to exhibits one through four (evidence of pre-lease communications between the parties regarding the BLACK PRINCE) based on the parol evidence rule.  The parol evidence rule excludes "extrinsic evidence offered to alter, augment, or contradict the unambiguous language of an integrated written agreement."  Handy Boat Serv., Inc. v. Prof'l Servs., Inc., 711 A.2d 1306, 1308–09 (Me. 1998).  If the contract's integration clause unambiguously indicates a fully integrated contract, the court should not allow presentation of extrinsic evidence on the question of integration.  See id. at 1309.  The integration

16

clause in the lease for the BLACK PRINCE states: "Entire Agreement. The terms of this document constitute the entire agreement between the parties, and the parties represent that there are no collateral agreements or side agreements not otherwise provided for within the terms of this agreement." Ex. 11. But extrinsic evidence may be admissible to assist interpretation of an ambiguity in an integrated agreement. See Handy Boat, 711 A.2d at 1309.

River Cruises does not argue that these exhibits help clarify an ambiguous term in the lease. Rather, River Cruises argues that these exhibits show that the lease was only partially integrated. The integration clause in the lease reflects a fully integrated contract. Extrinsic evidence to show that it is less than fully integrated is not admissible. Exhibits one through four are excluded.

Culebra II also objects to exhibits twelve through fourteen (a series of emails, subsequent to the lease, regarding a possible sale of pirate paraphernalia and a yacht signal cannon to River Cruises)[13] on the grounds that they are "post-lease documents" that relate to a subject (the cannon) that is not covered by the lease. Exhibits twelve through fourteen are admitted. To the extent that Culebra II argues these exhibits represent impermissible modifications of the lease,[14] I note that as emails, they may constitute written communications, see Roger Edwards, LLC v. Fiddes & Son, Ltd., 245 F. Supp.

---

[13] These exhibits appear to reflect negotiations between distinct entities (Long Reach Cruises and River Cruises) from those that are party to the BLACK PRINCE lease (Culebra II and River Cruises).

[14] The lease requires: "Any modification or amendment of this agreement shall be in writing and shall be executed by all parties."

2d 251, 261 (D. Me. 2003), and thus could modify the lease pursuant to its no-oral modifications clause.   To the extent that Culebra II objects to these exhibits based on the parol evidence rule, that rule does not exclude evidence of subsequent agreements between the same parties or agreements between different parties.   See Net 2 Press, Inc. v. 58 Dix Avenue Corp., 266 F. Supp. 2d 146, 166 n.11 (D. Me. 2003); 11 Richard A. Lord, Williston on Contracts § 33.23 (4th ed. 2007) ("All courts agree [under the parol evidence rule] that subsequent agreements may be shown, and are not rendered ineffective by the prior writing.").

## CONCLUSION

Judgment shall enter in favor of Culebra II, LLC for compensatory damages in the amount of $67,386.79 jointly and severally against both defendants.   Judgment shall enter against River Cruises on its counterclaims. Any motion for collection costs, attorney fees and interest shall be filed in accordance with the Local Rules.

SO ORDERED.

DATED THIS 9TH DAY OF JULY, 2008

/S/D. BROCK HORNBY
D. BROCK HORNBY
UNITED STATES DISTRICT JUDGE

18